## UNITED STATES v. BARNSDALL OIL CO.

### No. 2429.

Circuit Court of Appeals, Tenth Circuit.

April 30, 1942.

Frank J. Dugan and Aubrey Lawrence, both of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., Whit Y. Mauzy, U. S. Atty., of Tulsa, Okl., Charles R. Denny, of Washington, D. C., Hook & Thomas, of Kansas City, Mo., and Henry R. Duncan, of Tulsa, Okl., on the brief), for appellant.

Gentry Lee, of Tulsa, Okl. (Kirk, Lee & Fleetwood, of Tulsa, Okl., on the brief), for appellee.

Before PHILLIPS, HUXMAN, and WILLIAMS, Circuit Judges.

HUXMAN, Circuit Judge.

The question for consideration here is whether the appellee, the Barnsdall Oil

Company[1] was a trespasser and as such accountable to the Osage Tribe of Indians[2] for oil extracted from certain of the lands of the Tribe between March 16, 1916, and June 20, 1916. The facts necessary for consideration of the legal questions are substantially as follows:

On March 16, 1896, the Tribe executed an oil and gas lease to Edwin H. Foster, for a period of ten years, covering the entire Osage Reservation of approximately 1,500,000 acres. This lease expired by its own limitations March 16, 1906.

It was extended for an additional period of ten years by the Act of March 3, 1905, 33 Stat. 1048, 1061. Assignments of parts of the Foster lease were made to a great many sublessees. Barnsdall's interest arose under some of these assignments. The Foster lease finally expired March 16, 1916. Further leasing operations of the Tribe's oil lands were controlled by the Act of June 28, 1906, 34 Stat. 539. The pertinent portion of Section 3 of the Act provides that: "* * * Leases for all oil, gas, and other minerals * * * may be made by the Osage tribe of Indians through its tribal council and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe * * *."

Beginning with the early part of 1915, steps were taken looking to the execution of new leases to become effective at the expiration of the Foster lease. Pursuant to public notice, a hearing was held at Washington, D. C., by the Secretary of the Interior. The Osage Council was present at these hearings. At the request of the Secretary of the Interior, the Osage Council returned to Washington June 4, 1915, for further conferences with him and the Commissioner of Indian Affairs. After a ten day conference, the Tribal Council, on June 17, 1915, adopted and presented to the Secretary a set of resolutions embodying its recommendations for the leasing of the oil lands. With slight modifications they were approved, and the new leases were executed in conformity therewith.

On January 12, 1916, the Commissioner of Indian Affairs, with the approval of the Secretary of the Interior, advertised for the leasing of the lands involved herein at a public auction set for February 15, 1916. Prior to this date, a number of resolutions were introduced in Congress proposing different disposals of the oil lands involved. Among them was the Owens Resolution, which proposed that no sale be made of the leases for two years, and that the old lessees continue to operate during that period on specified royalties. The sale of the leases was first postponed to March 1, 1916, then to March 15, and finally to April 20, 1916. It may be fairly inferred that the pending resolution was one of the considerations which prompted the Secretary to postpone the public auction of the leases. At the sale on April 20, 1916, only part of the leases involved herein were sold to Barnsdall. The balance were sold to it at a sale advertised for June 20, 1916.

When it became apparent that no new lease would be executed by March 16, 1916, Barnsdall arranged to close down the operation of the wells, and so notified the Secretary of the Interior. At the time of these transactions it was believed by the Secretary of the Interior and by oil producers and operators generally that shutting down a producing well would wholly or partially destroy its value. On March 13, 1916, the Secretary notified all parties concerned that new leases could not be executed before the expiration of the Foster lease, and that he had authorized the sublessees to continue development and operation until April 16, 1916, in order that the properties might be protected pending the execution of the new leases. This order was extended to May 16 as to the leases that were not sold on April 20. The sublessees were required to pay during this interim period the increased royalties required in the new leases. Barnsdall agreed and continued to operate the properties. It operated the leases not sold April 20, under this arrangement until June 20.

On March 17, 1916, a member of the Tribal Council protested to the Secretary of the Interior against the order of March 13. The Tribal Council itself did not protest. Upon receipt of the protest, the Secretary requested the pipe line company purchasing the oil to withhold payment therefor until the proper distribution should be determined. July 6, 1916, he determined that Barnsdall was entitled to receive the value of the oil sold during this period, less the royalty provided for in the new leases. The royalty was thereupon paid to the Tribe and the balance to Barnsdall.

March 13, 1940, the government instituted this action against Barnsdall seeking

---

[1] Herein referred to as Barnsdall.

[2] Herein referred to as the Tribe.

recovery of the value of the oil received by Barnsdall during the interim period, together with interest thereon. Judgment was entered for Barnsdall, and the government has appealed.

The government's position is that the interim proceedings instituted by the Secretary of the Interior by his letter of March 13, 1916, constituted a lease; that Section 3 of the 1906 Act reposed the power to lease in the Tribe alone, subject only to the approval of the Secretary, and that the attempted lease by the Secretary alone was therefore void, and that Barnsdall was a trespasser and liable as such.

We cannot agree with the narrow interpretation the government seeks to place upon the powers of the Secretary of the Interior under the Act of 1906 with relation to the leasing of the Indians' land for oil and gas.

Throughout all its dealings with the Indians, the government recognized them as a dependent people, in need of the protective supervision of the government over their affairs and property rights. In the beginning, but little discretionary power was lodged in the Indians. The government exercised an almost absolute guardianship over them and their affairs. From time to time, as it thought proper, more power was lodged in the Indians, but always the ultimate or final control, unless relinquished, remained with the government. 5 U.S.C.A. § 485, places in the Secretary of the Interior the general supervision of the business affairs of the Indians. 25 U.S.C.A. § 2, evidences an intent on the part of Congress to place broad powers of management of Indian affairs with him.

While the Act of 1906 places with the Tribe the power to initiate lease proceedings, the supervisory powers given the Secretary make him the final arbiter as to the terms and provisions of the lease, so that the lease in the end is determined by him, subject only to the power of the President to determine and fix the amount of the royalty payment.

As was said in United States v. Macdaniel, 7 Pet. 1, 32 U.S. 1, 13, 8 L.Ed. 527: "A practical knowledge of the action of any one of the great departments of the government, must convince every person, that the head of a department, in the distribution of its duties and responsibilities, is often compelled to exercise his discretion. He is limited in the exercise of his powers by the law; but it does not follow, that he must show statutory provision for everything he does. No government could be administered on such principles. To attempt to regulate, by law, the minute movements of every part of the complicated machinery of government, would evince a most unpardonable ignorance on the subject. Whilst the great outlines of its movements may be marked out, and limitations imposed on the exercise of its powers, there are numberless things which must be done, that can neither be anticipated nor defined, and which are essential to the proper action of the government."

Section 12 of the Act of 1906 provides that "all things necessary to carry into effect the provisions of this Act not otherwise herein specifically provided for shall be done under the authority and direction of the Secretary of the Interior."

It is inconceivable that Congress could, or intended to, provide specifically for every possibility that might arise under the operation of the Act. Discretionary power to act in such matters must lodge somewhere. We think that Section 12 places it in the Secretary of the Interior.

Here the Secretary was confronted with a definite situation. Whether it should have arisen is beside the point. It is improbable that a new lease could have been made with a new lessee for this short period of time. The Tribe did not seek to procure such a lease. There is no evidence that it could have done so. According to the accepted standards of the oil fraternity at that time, shutting down these wells for sixty days would have seriously affected their value. In that event, when the leases were finally sold they would have brought much less than they did, which would have resulted in a substantial loss to the Tribe. As a result of the action of the Secretary, the Tribe received the increased royalty payment provided in the new leases from the very day of the expiration of the Foster lease, and also received increased bonuses, for the new leases over what they perhaps would have received had the wells been shut down during the interim period. We think the acts of the Secretary of the Interior are well within the discretionary powers reposed in him by Section 12 of the Act of 1906.

Affirmed.